#10

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
HOLLY SHALOM,

               Plaintiff,

     -against-

HUNTER COLLEGE OF THE CITY
UNIVERSITY OF NEW YORK, and PAUL CASCELLA,
MARILYN AUERBACH, and SUDI SHAYESTEH
(in their individual and official capacities),

               Defendants.
------------------------------------------------------------------X

**AMENDED COMPLAINT**

Jury Trial Demanded

Docket No.: 13-CV-4667 (SAS)

Plaintiff, HOLLY SHALOM, by her attorneys, WHITE, RICOTTA & MARKS, P.C., complaining of the defendants herein, alleges, upon knowledge as to herself and her own actions, and upon information and belief as to all other matters:

## JURISDICTION AND VENUE

1. This action is brought pursuant to 42 U.S.C. §1983, to redress violation of Plaintiff's constitutional rights by the Defendants, as well as deprivation by the Defendants, acting under color of state law, of the policies, ordinances, custom and usage of rights, privileges and immunities secured to the Plaintiff by the Constitution of the United States and all the laws and statutes thereunder, Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*, and any other cause of action that can be inferred from the facts set forth herein.

2. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343(3), and (4), 1367, and 2201.

3. Venue is proper pursuant to 28 U.S.C. 1391.

1

## PARTIES

4. Plaintiff, Holly Shalom ("Shalom"), was and still is a resident of Merrick, New York.

5. Defendant, Hunter College of the City University of New York ("Hunter College"), is a duly incorporated municipal entity of the State of New York with a principal place of business located at 695 Park Avenue, New York, New York 10021.

6. Defendant, Paul Cascella ("Cascella"), was and is the Department Chair of Hunter College's Speech – Language Pathology Department. Further, Cascella was and/or is responsible for Hunter College's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment, student admissions, student accommodations, and/or educational related issues. Additionally, Cascella is responsible for implementation of Hunter College's policies, charged with the responsibility of insuring that students are not subjected to discriminatory and/or retaliatory practices. Cascella had the power to make decisions regarding Plaintiff's education and enrollment at Hunter College. Cascella aided, abetted, compelled and/or incited the unlawful treatment set forth below.

7. Defendant, Marilyn Auerbach ("Auerbach"), was and is the Acting Senior Associate Dean of the CUNY School of Public Health at Hunter College. Further, Auerbach was and/or is responsible for Hunter College's maintenance and operation, including, but not limited to, the hiring, firing, promotion and discipline of employees and all other employment, student

admissions, student accommodations, and educational related issues. Additionally, Auerbach is responsible for implementation of Hunter College's policies, charged with the responsibility of insuring that students are not subjected to discriminatory and/or retaliatory practices. Auerbach had the power to make decisions regarding Plaintiff's education and enrollment at Hunter College. Auerbach aided, abetted, compelled and/or incited the unlawful treatment set forth below.

8. Defendant, Sudi Shayesteh ("Shayesteh"), was and is the Director of the Office of Accessibility at Hunter College. Further, Shayesteh was and/or is responsible for Hunter College's maintenance and operation, including, but not limited to, the granting of student medical accommodations, and other educational related issues. Additionally, Shayesteh is responsible for implementation of Hunter College's policies, charged with the responsibility of insuring that students are not subjected to discriminatory and/or retaliatory practices. Shayesteh had the power to make decisions regarding Plaintiff's education and enrollment at Hunter College. Shayesteh aided, abetted, compelled and/or incited the unlawful treatment set forth below.

## BACKGROUND FACTS

9. In Fall 2009, Shalom enrolled in the Communication Science Program at Hunter College in pursuit of a Master's degree in Speech – Language Pathology.

10. Through her time enrolled at Hunter College, Shalom has been assigned to at least two clinics which were overseen by Dr. Donald Vogel, as Clinic Director.

11. In Spring 2010, Shalom began her first clinic under the oversight of Vogel. Up to this point in her educational career at Hunter, Shalom had performed well overall and had passed all classes in which she had been enrolled.

12. Dr. Vogel evidenced a pattern and practice of discrimination against Shalom due to her gender. For example, Dr. Vogel declined to provide Shalom with similar assignments to those given to her classmates. Moreover, Dr. Vogel voiced doubts as to Shalom's capabilities even before she began his clinic.

13. Vogel also engaged in sexual harassing conduct. For example, rather than focus on her work product, and provide Shalom an equal opportunity within his clinic, Dr. Vogel engaged in a pattern of gender discriminatory and sexually harassing behavior, including regular commentary on Shalom's physical appearance and clothing, including that he did not like her hair in a ponytail, or that he did not like her hair curly. The issues Vogel had with Shalom's appearance were not issues that were within the college's dress code. In fact, Dr. Vogel threatened that the following semester he would require that Shalom appear at his office, one on one, on a daily basis, in order for him to "inspect" her appearance.

14. Vogel also commented on numerous occasions that Shalom had not given him the attention he sought when they would cross paths in the hallways of Hunter. Such conduct was not engaged in by Dr. Vogel with Shalom's classmates, specifically her male classmates, whose appearance and attire did not attract as much of an interest with Dr. Vogel as did Shalom's and other female classmates.

15. Without basis, and seemingly in response to Shalom's failure to respond to Dr. Vogel's sexually inappropriate behavior in the manner that Dr. Vogel desired, Dr. Vogel issued Shalom a failing grade for his clinic, despite the fact that the clinical supervisor, Ms. Blinder, issued Shalom a passing grade for her work product in the clinic.

16. As a result of this improper action by Dr. Vogel, Shalom appealed the grade and at a departmental hearing, outlined for Hunter College Dr. Vogel's sexually harassing and inappropriate behavior.

17. In August 2010, Shalom's failing grade in Dr. Vogel's clinic was overturned as a result of the departmental hearing and the baseless reasons for the failing grade being issued.

18. Shalom, having her grade corrected, sought to resume her educational career in order to ultimately begin her professional career. Defendant, however, began a course of conduct and harassment designed to retaliate against Shalom due to her complaints regarding Dr. Vogel's sexual harassment.

19. In September 2010, Shalom began her second clinic (COMSC 729) and immediately began receiving compliments from her clinical supervisors regarding her performance.

20. Shortly into this semester, however, Dr. Vogel began a campaign against Shalom designed to discriminate against and/or retaliate against her. Specifically, Vogel sent harassing emails to Shalom, which he copied to her present supervisors and the Department Chair, several nights in a row, wherein Vogel levied false allegations against Shalom regarding her conduct, discussed her previous appeal (which was prohibited by the student

handbook), and provided improper commentary regarding Shalom's speech therapy sessions (which was improper as he was not a licensed SLP, and as such, was only permitted to evaluate students on professional behavior).

21. Additionally, contrary to school policy, Vogel never provided Shalom with a rubric outlining the basis and manner in which he came up with her grade.

22. As a result of Vogel's retaliatory conduct, Shalom's supervisors began to retaliate against her and/or generated a newfound false perception of Shalom and her work product. Upon information and belief, this was due to Vogel's retaliatory influence.

23. As a result of Vogel's renewed harassment and retaliation, Shalom complained about Vogel's conduct to her Department Chair, Dr. Paul Cascella and Hunter College's Acting Senior Associate Dean, Dr. Marilyn Auerbach. Her complaints were ignored and Vogel issued Shalom yet another improper and baseless failing grade in COMSC 729.

24. Despite providing extensive proof of the unjustified nature of Vogel's grade and evidence of his pattern of harassment and retaliation, Shalom's grade was not reversed. As a result of Hunter College's support of Vogel's discriminatory and retaliatory behavior, Shalom was prevented from taking further academic courses until she repeated the COMSC 729 clinic. Moreover, Shalom was put in a position where she would be dismissed from the program if Vogel, an individual who had evidenced a prior disposition to harass, discriminate and retaliate against Shalom, issued her another failing grade in the clinic.

25. As a result of the continued harassment and retaliation by Defendant and Vogel, which

continued unabated despite prior complaints, Shalom required a leave of absence from the program. Moreover, Shalom pursued an Article 78 appeal of the Defendant Hunter College's discriminatory and retaliatory decision to uphold Vogel's grade. As a result of that proceeding, a stipulation was entered into wherein it was agreed that Shalom would repeat COMSC 729 in Spring 2012, and that Vogel would have no further involvement with Shalom. Instead, Dr. Cascella served in the capacity of Shalom's clinical director proceeding forward. Additionally, an independent supervisor, Lea Borenstein, was brought in to supervise Shalom.

26. During the first weeks of this clinic, Shalom received universally and overwhelmingly positive feedback regarding her performance from Borenstein.

27. Shortly thereafter, however, Shalom began to, once again, experience acts of harassment and retaliation. For example, Borenstein made false allegations that Shalom submitted assignments in an untimely manner, and that Shalom cheated by way of copying someone's work product. These allegations were without merit.

28. Additionally, on one occasion after Shalom had to leave the clinic early due to a female medical issue, Cascella contacted Shalom on numerous occasions via email requesting a detailed description as to what happened and why she had to leave the clinic. Cascella also began to levy accusations that Shalom left things in her room that she was working in and walked in on another's therapy session. These questions and accusations were both false and, with respect to the detailed inquiries into her medical issue, highly inappropriate. Shalom's similarly situated male students were not similarly harassed and questioned

regarding their gender-based illnesses. Shalom requested a meeting to discuss this issue with Cascella, but he refused.

29. As a result of this renewed harassment and retaliation, on March 14, 2012, Shalom wrote to Dr. Cascella complaining about this renewed illegal conduct and requesting that, as a result of this continued discrimination and retaliation, that she be permitted to resume her leave of absence, as Shalom began to experience symptoms of depression which required psychological treatment. Cascella denied her request to resume her leave of absence.

30. On March 22, 2012, Shalom, through counsel, also wrote to Defendant Hunter College's attorney, Steven Banks, Esq., outlining the continued sexual harassment and retaliation to which she was subjected.

31. On March 23, 2012, Shalom received evaluations of her work from Borenstein and Cascella which contained numerous false allegations regarding Shalom and her conduct. In Shalom's response, she provided reference to notes and tapes which proved their allegations to be false. Interestingly enough, Shalom was subsequently told to destroy these tapes and notes.

32. On March 29, 2012, Shalom submitted medical documentation in support of her request for a medical leave of absence. Within the medical documentation, Shalom's psychologist specifically attributed her depression to "antagonistic and undermining interactions with several supervisors and administrators."

33. On April 6, 2012, Shalom received correspondence from Defendant's counsel (despite

Defendant's counsel having knowledge of Shalom's being represented by counsel), directing Shalom to take certain steps in order to receive her leave of absence, including the destruction of all recordings of her diagnostic and therapy sessions, which is a request that runs contrary to New York State regulations. Moreover, the tapes and diagnostic notes did not contain any identifiable client information. Additionally, it was not COMSC policy to have students return or destroy tapes or diagnostic notes.

34. The following day, Shalom received and email from Dean Auerbach confirming Shalom's understanding of the steps Shalom would have to take prior to the granting of her leave of absence. This was in violation of Hunter's own rules and regulations (as well as the terms of the parties' Article 78 resolution) which, for student medical leaves of absence, only require medical documentation to be submitted, and do not require conditions to be set and met for a leave to be granted.

35. Shalom's leave of absence was formally granted on June 5, 2012, after months of unanswered emails and calls by Shalom and her counsel, which further exacerbated Shalom's condition.

36. On June 24, 2012, Shalom, through counsel, served Hunter College with a Notice of Claim, outlining her claims of discrimination and retaliation, as discussed above.

37. In August 2012, Shalom, through counsel, submitted a report from Shalom's mental health professional, certifying her ability to return to school the upcoming semester. Within this report, Shalom's mental health professional recommended, and her counsel requested, two

reasonable accommodations in order to accommodate Shalom's disability. Specifically, the accommodations requested were for Shalom to be able to continue her studies in a setting outside of Hunter (in an externship environment, which is granted to other students) and/or to permit her to resume academic classes (which she was prevented from continuing as a result of Vogel's improper grade).

38. On August 23, 2012, in a meeting with Ms. Sudi Shayesteh, Director of the Office of Accessibility for Hunter College, which addresses accommodation issues for students with disabilities, Shayesteh indicated that she intended on recommending to Shalom's department that her accommodation requests be granted, as they were both fair and reasonable.

39. Nonetheless, on August 29, 2012, Shalom's accommodation requests were not granted and rather, she was called to a follow up meeting with Shayesteh, Cascella, and Dean Auerbach whereat she was advised she would have to fill out more paperwork and provide further information before any accommodation for her disability would be considered.

40. Shalom provided this information and submitted the requisite paperwork on August 31, 2012.

41. On September 25, 2012, Shalom was advised that her requested accommodations were rejected. The reasons for rejecting her accommodations were false and pretextual in nature.

42. On September 30, 2012, Shalom sent a letter to Shayesteh, requesting that the college

reconsider their denial of her reasonable accommodation request. Shalom's counsel also communicated with Defendant's counsel, expressing his belief that Defendant was not providing a reasonable accommodation to Shalom. No response to these communications was received.

43. To date, Shalom has received no response, and the college has continued to deny Shalom a reasonable accommodation.

44. In October 2012, Shalom submitted a complaint of discrimination and retaliation against Hunter College to the United States Department of Education's Office of Civil Rights ("OCR").

45. On December 17, 2012, as a result of Defendant's continued refusal to grant Shalom reasonable accommodations for her disability, Shalom submitted a request to Cascella for an extension of her leave of absence.

46. On January 4, 2013, in retaliation for her complaints of discrimination and retaliation, Cascella submitted a response to Shalom denying her extension of leave based on the position that Shalom "did not identify a compelling reason" for the needed extension of her leave of absence, despite the fact that no such reason is required pursuant to Hunter's rules. This was also despite the fact that Shalom submitted the identical reason for an extension of her leave for the Fall 2012 semester, which was granted. This time, however, after Shalom had filed a complaint with OCR, her request was denied.

47. Shalom has continued to communicate with members of Hunter College in an effort to

receive an extension of her leave of absence, but, to date, Hunter has declined to offer her a reasonable accommodation or to extend her leave of absence.

48. In fact, on January 14, 2013, Shalom submitted a letter from her psychologist to Hunter indicating that requiring Shalom to return to school under the present conditions and without a reasonable accommodation would place Shalom at a severe risk of an exacerbation of her depressive symptoms. Despite this fact, and the continued requests for accommodations, Hunter has denied any and all accommodations, and has not engaged in an interactive process designed to come up with a mutually acceptable accommodation.

49. These actions are being taken by Hunter in retaliation for Shalom's repeated complaints regarding the harassment, discrimination, and retaliation to which she has been subjected by Defendant.

50. By reason of Defendant's violation of Plaintiff's rights, Plaintiff has suffered a prospective loss of monetary benefits associated with her graduation and subsequent employment, in addition to suffering physical, emotional, and other damages as well as an exacerbation of physical and emotional damages.

## **CLAIMS FOR RELIEF**

51. Hunter College wrongly subjected Plaintiff to discrimination and/or a hostile work environment on the basis of her gender and/or retaliated against Plaintiff and retaliated against Plaintiff due her complaints of discrimination/harassment. These actions are in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*

## 42 U.S.C. § 1983

52. The Individual Defendants, while acting under color of state law, deprived plaintiff of her constitutional rights, as secured by the Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983, and all related provisions of the New York State Constitution. Defendants intentionally committed, condoned or was deliberately indifferent to the aforementioned violations of plaintiff's constitutional rights.

53. The individual Defendants (in their individual capacities) unlawfully participated in and/or permitted the aforementioned discrimination to perpetuate, without abatement, in violation of Plaintiff's constitutional and statutory rights pursuant to 42 U.S.C. Section 1983.

WHEREFORE, Plaintiff demands judgment against Defendant for, where applicable, all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, injunctive relief, and any other damages permitted by law. It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled. Plaintiff demands a trial by jury.

Dated: Jackson Heights, New York
April 29, 2013

Respectfully Submitted,

WHITE, RICOTTA & MARKS, P.C.
*Attorneys for Plaintiff*
86-12 37th Avenue, Second Floor
Jackson Heights, New York 11372
(347) 464-8694 (phone)

(800) 483-4508 (fax)

_____
THOMAS RICOTTA (TR-1900)

14