# EXHIBIT A

## MEMORANDUM

To:       President Jennifer J. Raab

From:     Sexual Harassment Awareness and Intake Committee

Re:       Holly Shalom Sexual Harassment Complaint

Date:     July 20, 2011
-----------------------------------------------------

### Summary

Holly Shalom is a graduate student in the School of Health Sciences, Department Of
Communication Sciences. She is pursuing a Masters Degree in Speech-language
Pathology.

She alleges that she is being, "harassed and discriminated against." by Dr. Donald
Vogel, Clinical Director of the Hunter College Center for Communication Disorders as a
result of certain acts which occurred during the spring and fall 2010 semesters .

Ms. Shalom's initial contact with Dean John Rose's office did not indicate the basis of
her complaint against Dr. Vogel. The initial communication was December 27, 2010.
Ms. Shalom and/or her mother wrote and/or called Dean Rose several times, and a
meeting was set for January 13, 2011. At that meeting Ms. Shalom was accompanied
by her mother Lenore Shalom and her father Samuel Shalom. Although Ms. Shalom
asserted that Dr. Vogel had "predetermined" that she fail the clinical component of her
training, the only event which she described that was clearly related to her sex and
gender, was a comment that Dr. Vogel had made about her appearance and her hair.

1

She indicated that Dr. Vogel's comment and certain other conduct of a harassing nature resulted in her receiving a failing grade in her clinical component.

Intake investigation of Ms. Shalom's complaint was conducted by John T. Rose, Coordinator of the Sexual Harassment Awareness and Intake Committee ("SHAIC"), and by Erica Pearson, Counselor, Student Affairs and member of the SHAIC Committee.

The investigation included review of e-mails and other written materials and interviews with the complainant, Dr. Vogel, other administrators at the School of Health Sciences and the two Clinical Supervisors in the Speech Pathology program.

We conclude that the comments made by Dr. Vogel with respect to Ms. Shalom's hair and attire, were not inappropriate under the circumstances and do not constitute sexual harassment or discrimination against her because of her gender. We also conclude that certain other acts and conduct on the part of Dr. Vogel which are the subject of Ms Shalom's complaint were not inappropriate and do not constitute sexual harassment or discrimination because of her gender

## The Allegations

Holly Shalom and her parents assert that Dr. Donald Vogel engaged in a series of harassing actions against her, in part because of her gender, and in part in retaliation for her successful grade appeal from a failing grade in the clinic component of her courses in the spring of 2010. Among harassing conduct alleged to have been engaged in by Dr. Vogel is making false accusations that Ms. Shalom left materials, toys, and objects left strewn about the clinic room; making false allegations that Ms Shalom left client evaluations, observations, and assessments (which are HIPPA sensitive) in plain view on the clinic desk in lieu of being placed in the client files as required by protocol; inappropriately discussing her grade appeal with the clinical supervisors Mrs. Westle

2

and Mrs. Bousel; inappropriately commenting on her therapy sessions with Mrs. Westle and Mrs. Bousel, (such comments are allegedly inappropriate under ASHA regulations); and commenting inappropriately on her hair and her dress.

Ms. Shalom asserts that she consistently followed the appropriate protocols regarding the organization of the clinic room and the client waiting areas. She asserts that she was meticulous in removing objects, materials, and toys which the clients may have used during the course of the clinical session and that any objects that may have been left in the clinic or waiting room area were left by others who may have had access to the area when she was finished. Ms. Shalom also asserts that she never left client evaluations, assessments, or papers out on the desk, but always was sensitive to place them in the appropriate client files and to place the files in the appropriate file cabinets so they were not exposed. She said she was scrupulous in following the HIPPA regulations with respect to client files.

She said that she was told she could discuss the grade appeals and the results with the supervisors Mrs. Westle and Mrs. Bousle, but declined to do so. She said that she was surprised to learn that Dr. Vogel had in fact advised them of the grade appeal and thought that was inappropriate of him to do so and an invasion of her privacy.

Ms. Shalom asserts that Dr. Vogel is an audiologist and as such is not qualified to comment on the therapy session that were conducted by the speech pathologist. Ms. Shalom believes that the regulations of the American Speech-Language Hearing Association ("ASHA") are very clear on what qualifications are required for commenting on clinical interventions by speech pathologist and that audiologist are not qualified to make such comments. Thus any conversation between Dr. Vogel as an audiologist and the clinical supervisors Westle and Bousel as pathologists would be inappropriate and inconsistent with the ASHA regulations.

3

With respect to the hair and dress Ms. Shalom asserted that Dr. Vogel told her that her hair was kept in an inappropriate manner. Ms. Shalom indicated that on the day in question she had her hair in a pony-tail and was told by Dr. Vogel that you look like you just came from the "gym". She added that Dr. Vogel never made clear what the issues with her clothes were.

## Vogel's response to the Allegations

Dr. Vogel denies engaging in any acts of retaliation against Ms. Shalom on account of the successful grade appeal that she made during the spring of 2010. He respects her rights to appeal any grade that she is given and understands that the grade appeal process was one that was fairly conducted and he was (and remains) prepared to abide by its results. With respect to the dress and attire issue, Dr. Vogel points out that he would from time to time make comments as to other students with respect to their attire. In particular he points to a period of time during the winter months when many students came to clinic wearing inappropriate clothing. At the time, he indicated that he would send memos to groups of students with respect to attire issues reminding them of the importance of appropriate professional attire at all times. Dr. Vogel indicated appropriate attire is a requirement specifically identified in the guidelines for professional students that were handed out to all graduate students. The Clinic Handbook for Communication Sciences has a section on professionalism which identifies attire as an appropriate requirement for all students, and copies of this Handbook were provided to Ms. Shalom. With respect to the particular comment in question, Dr. Vogel recalls that her hair was pulled back as if she had been wearing a headband ( similar to what some wear at gymnasiums to keep their hair out of their face) and that the attire was not clinic appropriate and did not present a professional image . He believes he has consistently addressed appropriate standards for Ms. Shalom as well as for all students in the program and did not single out Ms Shalom for reasons attributable to her sex or gender.

4

With respect to the materials, toys and objects that were left out, Dr. Vogel indicated that in several instances he has observed that materials were left out in the evaluation or exam room, and in other instances one of the clinic supervisors Mrs. Westle or Mrs. Bousel would bring that matter to his attention.  He also pointed out that he had images (a photograph) of these materials taken immediately following a session that Ms. Shalom had with a patient.

With respect to the client assessment/ evaluations left out of files and in plain view, Dr. Vogel indicated that this information came to his attention through the clinic supervisors, Mrs. Westle or Mrs. Bousel, or in one instance through a student that found the material and made that information known to the clinic supervisor.

Finally with respect to the grade appeal Dr. Vogel acknowledged having a conversation with Ms. Shalom regarding whether she would be willing to discuss both the results of the grade appeal and the circumstances which led her to make the appeal with the clinical supervisors.  He indicated that he thought it was appropriate for him to advise the supervisors that there had been an appeal (as opposed to discussing the circumstances of why the appeal had been taken)  and that Ms Shalom decided to repeat the clinic notwithstanding the appeal, so that the clinicians would better understand what skill sets she might need to advanced to the next level.

Lastly, Dr. Vogel denies having had any conversation with either the clinical supervisors regarding their evaluation or requesting that they change their evaluation of Ms. Shalom.  He pointed out that he discussed all students and their progress with the clinical supervisors, with a view towards understating where students stood, who was making progress and who may need additional assistance, but in no instance with a view toward changing or encouraging the clinicians to change their evaluation or assessment of the student.

5

CUNY 0001696

**The Investigation**:

We interviewed  the following people of the following dates

Ms. Shalom in person on January 13, 2011.

Dean Marilyn Auerbach in person on February 2, 2011.

Dr. Donald Vogel in person on June 9, 2011.

Dr. Paul Cassella in person on June 9, 2011

Mrs. Robin Westle via telephone on July 11, 2011.

Ms. Diana Bousel via telephone on July 14, 2011.


We received a number of e-mails from Ms. Shalom and Dr. Vogel dated from February 2010 through December 2010. We also reviewed the Communication Sciences Program Handbook and the Communication Sciences Clinic Handbook for the students for the 2010-2011 academic year.

**<u>Findings and Conclusions</u>**

Graduate students in the Speech Pathology program are provided with a variety of documents and materials at the inception of the program that describe various standards and expectations to which they will be held as they progress throughout the program. Among these documents are the Clinic Handbook and the Program Handbook.  Both documents articulate the need for "professionalism" in dealing with client groups and the Clinic Handbook in particular identifies some of the elements of professionalism as demeanor, appearance and attire, and specifies certain types of attire that would be considered inappropriate.

Each student is graded on the clinical component of their training using a Knowledge and Skills Acquisition ("KASA") evaluation form.  The form evaluates the students progress, competency and proficiency in several skills categories including the following: development and planning therapy, therapeutic intervention, writing skills, and professional-personal.

6

In each of these evaluation categories, both clinical supervisors have made observations about Ms. Shalom's performance and progress and have recorded those observations on the KASA evaluation form that they have completed. For example Mrs. Westle, with respect to development and planning therapy, wrote for the midterm comment: "Holly continues to need guidance in developing ways in which to present material in her lessons and in implementation activities which allow the client to get the most from the session." Similarly, Mrs. Bousel wrote "Goals have taken a substantial amount of time to be established, though they are limited to articulation skill of 2 phonemes in isolation and/or at word level". By the end of the semester, Mrs Westle believed that Ms Shalom had shown" significant improvement", but needed to " use her energy to continue to develop the skills which will enable her to become a fully independent clinician". Mrs Westle was more critical, noting in her final comments that Ms. Shalom did not show "flexibility and /or creativity" with integrating activities into speech goals.

With respect to therapeutic intervention Mrs. Westle wrote at midterm, "At times Holly appears uneasy in the treatment room. She does not always maximize the use of her time." Similarly, Mrs. Bousel wrote at midterm. "This is where Holly has had to improve the most...she required specific and repetitive re-directing in order to effectively integrate and carry out therapy".By the end of the semester, Mrs. Westle acknowledged improvement, but cautioned "there is room for her to continue to grow and develop". Mrs. Bousel was less optimistic at the final, noting Ms. Shalom stayed with interventions "even when they were not working".

With respect to professional-personal Mrs. Westle wrote in the midterm comments: "She continues to need guidance in remembering to leave the treatment room as she found it." Mrs. Bousel midterm comments were as follows: "...she seems to be trying to correct her time management and organizational challenges". By the final, Mrs Westle still cautions "Holly needs to be cognizant of scheduled meeting times and arrive on time and prepared". Echoing the same concern but from a slightly different perspective, Mrs.

7

Bousel wrote in her end of term comments "Holly seemed only partially aware of how her lack of preparation negatively influenced her clinical performance"

The KASA form provides for a rating scale that goes from 0 to 4 in each of the categories with respect to each skill or competency within a category. A rating of 3 or above is generally considered good; a rating below 3 suggests that assistance and guidance continues to be needed with respect to that competency. With respect to the midterm evaluation, Ms. Shalom failed to secure a grade of 3 or above in any of the competency areas, although Mrs. Bousel did score her above a 3 in personal-professional. By the end of the semester, Ms Shalom had only improved significantly in one evaluation category: Mrs. Westle gave her a 3.0 in therapeutic intervention.

Both clinical supervisors indicated that the evaluations were based on their personal observations from week-to-week of Ms. Shalom's progress and were not influenced in anyway by comments or suggestions that Dr. Vogel may have made. Both clinical supervisors acknowledges that from time-to-time they discussed all students progress with Dr. Vogel; but indicated the student evaluations are left to their judgment not to Dr. Vogel's judgment. Both Clinical supervisor indicated that Dr. Vogel never asked them to change a student evaluation.

With respect to the category of personal-professional, Mrs. Westle notes that Ms. Shalom did not leave the treatment room as she found it. This is consistent with observations that have been made by Ms. Bousel and by Dr. Vogel that objects were left out, papers were not placed in the appropriate file, and that Ms. Shalom was not as attentive to leaving the room clean and organized and unobstructed for the next user.

While Ms. Shalom asserts that e-mail messages from Dr. Vogel addressing this issue constitute a form of harassment, we note that Dr. Cassella who is the overall director of the speech pathology program has advised that one of the reasons why the grade appeal from Ms. Shalom's failing grade in the spring of 2010 was successful was

8

because there was a lack of documentation regarding her various shortcomings. Dr.
Vogel may well have understood this to require more attention and documentation on
his part to the problem performance areas. Ms Shalom has viewed this extra attention
as a form of harassment.

Dr. Cascella has also advised that Ms. Shalom's interpretation of the ASHA regulations
is at variance with his interpretation and the practice of the Department. He said that it
was perfectly appropriate for Dr. Vogel to inquire about any student and to discus
student progress with the clinical supervisors.

Finally with respect to the issue of appearance and attire this appears to have not have
been not been a consistent concern but an issue that was raised during February 2010.
Dr. Vogel has indicated that he addressed a number of student's attire during that
period of time and it does not appear that Ms. Shalom was in anyway singled out
because of her gender on the issue of attire and appearance.

9